1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JORGE RIVERA, JR.,                          No.  1:25-cv-00900-JLT-SKO (HC)

12                     Petitioner,               **FINDINGS AND RECOMMENDATION
                                                 TO DENY PETITION FOR WRIT OF
13          v.                                   HABEAS CORPUS**

14                                               **[TWENTY-ONE DAY OBJECTION
15   WARDEN, KERN VALLEY STATE                   DEADLINE]**
     PRISON,
16                     Respondent.

17

18          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254. He filed his petition on July 21, 2025, challenging a 2023

20   conviction for murder. (Doc. 1.) Respondent filed an answer to the petition on September 11,

21   2025, under seal. (Sealed Doc. 6.) Petitioner did not file a traverse.  Upon review of the pleadings,

22   the Court finds the petition to be without merit and will recommend it be **DENIED**.

23   **I.      STATE COURT PROCEDURAL HISTORY**

24          Petitioner was convicted in the Tulare County Superior Court on February 14, 2023, of

25   one count of first degree murder (Cal. Penal Code § 187); one count of possessing a firearm as a

26   convicted felon (Cal. Penal Code § 29800(a)); and one count of possessing an assault weapon

27

28
                                                 1

1  (Cal. Penal Code § 30605(a)). (Doc. 11-2 at 69.[1]) The jury also found true special enhancement

2  allegations that Petitioner had personally and intentionally discharged a firearm causing death

3  (Cal. Penal Code § 12022.53(b),(c),(d)). (Doc. 11-2 at 69.) On March 29, 2023, Petitioner was

4  sentenced to serve an indeterminate prison term of 25 years to life for the murder count, and a

5  consecutive 25 years to life sentence for the firearm enhancement. (Doc. 11-2 at 69.) He was also

6  sentenced to concurrent terms of two years for each of his convictions on counts two and three.

7  (Doc. 11-2 at 69.)

8       Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

9  DCA").  On August 24, 2024, the Fifth DCA affirmed the judgment in a reasoned decision.

10  People v. Rivera, No. F086028, 2024 WL 3944664, at *5 (Cal. Ct. App. Aug. 27, 2024). The

11  California Supreme Court summarily denied the petition for review on November 13, 2024. (Doc.

12  11-24.)

13  **II.    FACTUAL BACKGROUND[2]**

14       A.    The Murder

15       Before this murder, Petitioner worked at a dairy for a little over one year. He filed

16  approximately three workers' compensation claims while employed there before he voluntarily

17  quit. The parties agree that Petitioner's relationship with the dairy was "contentious."

18       On September 3, 2019, Petitioner, armed with a loaded firearm, confronted the dairy's

19  owner, Anthony Dragt. Dragt ran from Petitioner, who chased him. Petitioner was seen firing at

20  Dragt, who fell to the ground. Petitioner went to his vehicle parked nearby, but then went back to

21  where Dragt was lying on the ground, and fired additional shots at Dragt. Petitioner fled in his

22  vehicle.

23       Later that same night, law enforcement conducted a traffic stop and arrested Petitioner.

24  Multiple firearms were recovered from Petitioner's vehicle. Testing confirmed that Petitioner's

25  firearms had been used to kill Dragt. When arrested, Petitioner had gunshot residue on his hands,

26  _____

27  [1] Citations are to ECF pagination.
   [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§

28  2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts as set forth in
   Rivera, 2024 WL 3944664, at *1-4. See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

on his shirt, and on his belt.

Petitioner shot Dragt seven times. The fatal shot was delivered to Dragt's head, but other shots to the torso were potentially fatal.

### B.    The Expert's Report Regarding Petitioner's Competency

Petitioner was arraigned in this matter in September 2019. His legal counsel declared doubt regarding Petitioner's competency to stand trial. The court suspended criminal proceedings, and appointed a psychologist to evaluate Petitioner.

In October 2019, the appointed psychologist, Stacy McLain, filed a report opining that Petitioner was not competent to stand trial. Petitioner had expressed to McLain that he suffers from auditory hallucinations, but he was not sure when he first experienced it. He claimed he hears "different voices and they often tell him to hurt himself." He also reported a history of visual hallucinations that occur "off and on." Petitioner reported to McLain that he first participated in mental health services in high school, and he was assigned a therapist. He was not certain when he was first prescribed psychiatric medications.

According to McLain's report, Petitioner's auditory hallucinations were the most distressing symptom because Petitioner reported that they made him frustrated and angry, and he "can't control it." Petitioner reported that the auditory hallucinations disrupted his sleep and his concentration. He described being distracted by them during his court appearance in this matter.

### C.    The Evidence at the Competency Hearing

In February 2020, the trial court conducted a contested competency hearing. The material evidence is summarized below.

#### 1.    McLain's testimony

McLain has a doctorate degree in psychology. The court recognized her as an expert. McLain met with Petitioner for about one hour. According to McLain, Petitioner had "genuine complaints" of "psychotic symptoms" which were "interfering with his ability to attend to what was going on in court and assist his attorney in his own defense." McLain opined that Petitioner understood the nature and purpose of the trial proceedings, and had organized and coherent thoughts. Petitioner was able to explain the differences between attorneys, the judge and the jury.

1    McLain believed that Petitioner had been able to have an organized conversation with her.

2            McLain was aware that Petitioner had spent time in prison before, and she believed he

3    understood the criminal process. Petitioner was able to explain the meaning of the charges.

4    However, McLain was concerned that Petitioner did not understand the seriousness of his current

5    charges and Petitioner believed the charges "would somehow go away."

6            McLain found that Petitioner suffered from an "unspecified psychosis." She could not

7    provide a more precise diagnosis because she did not have the required evidence of symptoms

8    over a six-month period. She noted to the court that she was unable to review any medical

9    records. McLain agreed in court that her main concern involved Petitioner's self-described

10   hallucinations. She was also concerned about Petitioner "responding to internal stimuli." She

11   believed that Petitioner's "internal stimuli" affected his conversation with her, but she noted she

12   had been able to compensate for that as a trained psychologist when speaking with Petitioner,

13   who was "generally on topic and engaged."

14           Petitioner reported to McLain that he was prescribed Zyprexa, an antipsychotic. At the

15   time of their meeting, Petitioner had been taking Zyprexa for one or two weeks. McLain opined

16   that Petitioner's psychotic symptoms had impacted his experience in the courtroom. Petitioner

17   had indicated to her that his psychotic features were insufficiently controlled with his medication

18   at that time. McLain opined that, if Petitioner's medications were adjusted, those symptoms

19   interfering with his ability to participate in his defense would improve. McLain did not believe

20   Petitioner was malingering. She believed Petitioner was benefiting from Zyprexa and she opined

21   that an increase in dosage would likely resolve Petitioner's remaining barriers to competency. She

22   encouraged Petitioner to discuss the dosage issue with his medical provider, and he had agreed to

23   do so.

24                   2.      The defense's other witness

25           In addition to McLain, the defense called to testify one of Petitioner's former work

26   colleagues. The colleague had worked with Petitioner at the dairy for a couple of weeks.

27   According to the colleague, Petitioner was "not right in the head." The colleague had seen

28   Petitioner "talking to himself sometimes."

1

        3.      The prosecution's evidence

2       The prosecutor did not elicit any expert testimony to rebut McLain's opinion that

3   Petitioner was not competent to stand trial. Instead, the prosecutor called lay witnesses who had

4   observed Petitioner on a daily basis.

5                           *a.    Dragt's son*

6       Dragt's adult son testified that Petitioner had worked at the dairy for about eight months.

7   Petitioner had no work-related issues. The son never saw Petitioner talking to himself, and there

8   were no concerns that Petitioner was ever hearing voices. While working at the dairy, Petitioner

9   had filed workers' compensation claims.

10                          *b.    The correctional deputies*

11      The prosecutor called four correctional deputies to testify. The deputies had all spent time

12  interacting with Petitioner while he was in custody in this matter.

13      Three of the officers saw Petitioner about every 30 minutes during their respective shifts.

14  They would see him about 24 times during a typical 12-hour shift. None of the officers ever saw

15  Petitioner act strangely. Petitioner did not act like he was having auditory or visual hallucinations.

16  All three officers testified that they had previously encountered inmates who suffered from

17  hallucinations, but Petitioner did not exhibit such behavior. None of the officers felt the need to

18  refer Petitioner for a psychological evaluation.

19      The fourth deputy had contact with Petitioner on September 3, 2019. She went over a

20  mental health questionnaire with Petitioner. Petitioner was very friendly and talkative with this

21  deputy, and he seemed to understand the questions. Petitioner answered everything appropriately.

22  During this interview, Petitioner denied having any mental health issues. He denied having any

23  depression, being bipolar or taking any medication. The deputy spoke with Petitioner for about 90

24  to 100 minutes. During that time, Petitioner never appeared to be suffering visual or auditory

25  hallucinations.

26                          *c.    The recorded jail calls*

27      The prosecutor introduced into evidence two recorded jail calls, which occurred on

28  October 26 and 27, 2019. In those calls, Petitioner spoke with various members of his family and

5

1    at no time did he appear confused.

2    In one call, Petitioner encouraged his younger sister to keep up her grades to get into

3    college, and to get a scholarship. Petitioner encouraged her to get into clubs and sports to build up

4    her resume for college. Later in that same call, Petitioner discussed with his mother her

5    refinancing of her vehicle loan. Petitioner suggested she should get a multi-car discount through

6    her insurance company.  In the other call, Petitioner discussed the remaining balance ($1.62) on

7    his account in jail. He stated that, because his account was so low, he had received two free

8    stamps. During this call, Petitioner directed family members to not put money on his books that

9    night so he could get two more free stamps. Petitioner also said he wanted to use a P.O. Box to

10    write letters because he did not want people to know his street address.

11    D.    The Court's Competency Ruling

12    After hearing the evidence and the arguments from counsel, the court orally issued its

13    ruling. The court stated its belief that McLain had been a good witness, and the court noted that

14    McLain's "major concern" was Petitioner's hallucinations. The court also noted that McLain

15    believed Petitioner's hallucinations could probably be controlled by an increase in dose of

16    Zyprexa.

17    Although the court generally liked McLain as a witness, the court stated her ultimate

18    opinion "was very limited." The court noted that McLain did not have all of the information, such

19    as a mental health history. The court found it significant that a mental health history did not

20    appear to exist for Petitioner.

21    The court noted that McLain's diagnosis of incompetency was based almost exclusively

22    on Petitioner's self-reported statements and actions. The court ruled that, in light of the

23    prosecution's evidence, the defense had not overcome the presumption that Petitioner was

24    competent to stand trial. The court reinstated criminal proceedings.

25    E.    The Additional Competency Concerns Raised Below

26    The trial court found Petitioner competent to stand trial in February 2020. In November

27    that year, Petitioner's trial counsel filed a memorandum declaring a renewed intent to raise doubt

28    regarding Petitioner's competency to stand trial. The People filed an opposition to Petitioner's

6

1  request to suspend criminal proceedings.

2      On November 30, 2020, the court denied without prejudice Petitioner's request to suspend

3  criminal proceedings. The court found that Petitioner had not presented any evidence of changed

4  circumstances supporting his motion.

5      On October 21, 2022, the trial court reconsidered Petitioner's competency after his

6  defense counsel again raised that issue. The court again found no substantial change in

7  circumstances to justify suspending the criminal action. That same day, Petitioner entered an

8  additional plea of not guilty by reason of insanity (NGI), to go along with his previous not guilty

9  plea. The court appointed doctors for a sanity evaluation.

10     Dr. Leite and Dr. Rassti were appointed to evaluate Petitioner. On November 22, 2022,

11 Dr. Leite performed a 4-hour mental health evaluation which included: a face-to-face clinical

12 interview; mental status examination; Miller Forensic Assessment of Symptoms Test; Structured

13 Interview of Reported Symptoms Test; and Rogers Criminal Responsibility Assessment Scales.

14 Dr. Leite concluded Petitioner was malingering. (Sealed Doc. 2 at 6-7.) Dr. Leite determined that

15 Petitioner was able to know and understand the nature and quality of his act and distinguish right

16 from wrong at the time of the commission of the offense. (Sealed Doc. 2 at 7.) Dr. Rassti could

17 not perform an evaluation because Petitioner failed to cooperate. (Sealed Doc. 3.) On January 27,

18 2023, Petitioner withdrew his NGI plea and he proceeded to trial solely on his plea of not guilty.

19 **III.    DISCUSSION**

20     A.    Jurisdiction

21     Relief by way of a petition for writ of habeas corpus extends to a person in custody

22 pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

23 treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

24 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

25 guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare

26 County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

27 2254(a); 28 U.S.C.§ 2241(d).

28     On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

2   enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

3   filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA

4   and is therefore governed by its provisions.

5          B.    Legal Standard of Review

6       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

7   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

8   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

9   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

10   based on an unreasonable determination of the facts in light of the evidence presented in the State

11   court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

12   Williams, 529 U.S. at 412-413.

13       Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

14   federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

15   Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

16   [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141

17   (2005) (citing Williams, 529 U.S. at 405-406). This court looks to "Supreme Court holdings at

18   the time of the state court's last reasoned decision" as "the source of clearly established Federal

19   law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

20   Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

21   "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S.

22   120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

23   federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

24   would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

25   context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

26   fundamental enough that when new factual permutations arise, the necessity to apply the earlier

27   rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

28   court may draw a principled distinction between the case before it and Supreme Court caselaw,

the law is not clearly established for the state-court case." <u>Murdoch v. Castro</u>, 609 F.3d 983, 991 (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state court decision.'" <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014) (quoting <u>Yarborough</u>, 541 U.S. at 666).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" <u>Shinn v. Kayer</u>, 592 U.S. 111, 118 (2020) (quoting <u>Virginia v. LeBlanc</u>, 582 U. S. 91, 93 (2017) (*per curiam*)). Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." <u>Richter</u>, 562 U.S. at 103 (emphasis added); <u>see also</u> <u>Kayer</u>, 592 U.S. at 118. In other words, so long as fairminded jurists could disagree with each other as to whether the state court was correct, the state court decision is not unreasonable under AEDPA. Congress "meant" this standard to be "difficult to meet." <u>Richter</u>, 562 U.S. at 102.

Section 2254(d)(2) pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997). The federal habeas court must give "substantial deference" to the state court. <u>Brumfield v. Cain</u>, 576 U.S. 305, 314 (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the burden of overcoming the presumption with "clear and convincing evidence to the contrary."

1   Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

2   when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries,

3   114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*,

4   Maddox v. Taylor, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might

5   disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

6   factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

7   original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

8          To determine whether habeas relief is available under § 2254(d), the federal court looks to

9   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

10  Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

11  (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

12  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

13         The prejudicial impact of any constitutional error is assessed by asking whether the error

14  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

15  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

16  (holding that the Brecht standard applies whether or not the state court recognized the error and

17  reviewed it for harmlessness).

18         C.      Review of Claims

19         Although Petitioner raises two claims for relief, they are essentially one claim regarding

20  his competency to stand trial. He claims the trial court should have found him incompetent to

21  stand trial in light of his mental health records and the fact he was on medication for serious

22  mental illness. Petitioner raised the claim on direct appeal in the state courts. In the last reasoned

23  decision, the appellate court denied the claim as follows:

24         **I.      Substantial Evidence Supports the Trial Court's Ruling.**

25         Appellant argues the trial court erred in finding him competent to stand trial and
            reinstating the criminal proceedings. According to appellant, McLain's expert
26         opinion— which went unrefuted by another expert—was sufficient for the court to
            find him incompetent. Appellant asks us to remand this matter for further
27         proceedings.

28         We reject appellant's arguments. Substantial evidence supports the ruling that

appellant was competent to stand trial. The trial court did not err in declining to follow McLain's opinion.

Both California law and the federal due process clause prohibit the state from trying a defendant who is mentally incompetent. (§ 1367; *Pate v. Robinson* (1966) 383 U.S. 375, 378.) However, a criminal defendant is presumed competent to stand trial. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797.) The defendant bears the burden by a preponderance of the evidence to establish his or her own incompetency. (*Ibid.*)

Under California law, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) When a question is raised regarding competency, section 1368 requires the defendant to receive "a hearing" to resolve that issue. (§ 1368, subd. (b).) "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant." (§ 1369, subd. (a)(1).)

On appeal, a reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the trial court's finding that a defendant was competent to stand trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 131.) "Evidence is substantial if it is reasonable, credible and of solid value." (*People v. Marshall* (1997) 15 Cal.4th 1, 31.)

We agree with respondent that substantial evidence supports the trial court's ruling that appellant was competent to stand trial. In general, much of what appellant reported to McLain showed his competency. He understood the judicial process and the roles of the participants. He understood the nature of the charges and that he faced incarceration. He generally had organized and coherent thoughts.

Dragt's son testified that, when appellant worked at the diary, the employer never had any issues with him. However, there is a conflict in the evidence regarding whether appellant was seen speaking to himself while working at the dairy. Dragt's son denied seeing such behavior while appellant's work colleague reported such behavior. It is apparent that the trial court resolved that issue against the defense, and we will not second-guess how the court viewed such evidence. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 883 [it is not the appellate court's role to reweigh evidence].)

Four correctional deputies spent time with appellant. Three of the deputies saw appellant about 24 times a day, or about every 30 minutes during a 12-hour shift. None of the deputies ever saw appellant acting strangely, hallucinating, or talking to himself. Appellant had no trouble communicating with the deputies. He was able to follow directions and he was never a disciplinary problem. No deputy ever felt the need to refer appellant for a psychological evaluation. These three deputies had previously encountered inmates who were hallucinating or talking to themselves. None of the deputies ever saw similar concerns with appellant.

The fourth deputy spoke with appellant on September 3, 2019. They spoke for at least 90 minutes as they went over a mental health questionnaire. Appellant answered questions appropriately and he denied any mental health problems. During their lengthy conversation, appellant never appeared to be suffering from hallucinations or hearing voices.

The court heard two recorded jail calls in which appellant interacted with various family members. At no time did appellant seem confused or that he was hearing voices. During one call, appellant gave advice to his younger sister to keep up her grades to get into college. He encouraged her to get into clubs and sports to build up her resume for college. At no time during the two recorded calls did appellant complain of any mental health issues. Based on a representation of facts from the recorded jail call, McLain noted during her testimony that appellant's advice to his sister about engaging in activities that would aid her ability to obtain an academic scholarship could show "higher order thinking."

We reject appellant's assertion that the trial court was obligated to adopt McLain's expert conclusion that appellant was incompetent to stand trial. The court was free to decide for itself what weight, if any, should be given to McLain's opinions. (*People v. Lawley, supra*, 27 Cal.4th at p. 132; *People v. Jones* (1990) 51 Cal.3d 294, 314 [it is the exclusive province of the finder of fact to determine witness credibility and the truth or falsity of the facts]; *Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1003 ["the trier of fact is exclusive judge of the weight to be given to expert testimony"].)

The court stated it believed McLain had been a good witness. However, the court was concerned that McLain had based her conclusion largely on appellant's self-reported symptoms. The court observed that McLain "did not have all the information. She had no mental health history. And there does not appear to be any, which is significant to the Court." The court concluded that McLain's opinion "was limited." The court ruled that, given the evidence presented by the prosecution, appellant had failed to overcome the presumption of competency.

This record supports the trial court's concerns regarding the limited information supporting McLain's opinion. McLain admitted in court that she did not have all of the information. Indeed, during cross-examination, McLain admitted that she was unaware about the jail recordings in this case, which she had not reviewed. She was also unaware of the police reports. She did not have access to appellant's mental health records from the jail. McLain was not aware that appellant had previously filed the workers' compensation claims against the dairy.

The court considered McLain's testimony and it weighed the circumstances surrounding her expert conclusions. The court correctly observed that no medical records supported appellant's self-serving claims. The court heard from four prosecution witnesses who had interacted with appellant on a daily basis. From the People's evidence, the court was free to conclude that appellant had not exhibited auditory or visual hallucinations. As such, the court had ample grounds to make credibility findings adverse to the defense, and we will neither reweigh the evidence nor reevaluate witness credibility on appeal. (See *People v. Jones, supra*, 51 Cal.3d at p. 314 [it is the finder of fact who judges witness credibility and the truth or falsity of the facts].) Because McLain based her expert opinion largely on appellant's self-reported hallucinations, the court was justified in declining to adopt McLain's ultimate opinion. The court acted well within its discretionary authority regarding how to evaluate the evidence.

Based on this record, appellant failed to meet his burden of proof to overcome the presumption he was competent to stand trial. The trial court had ample evidence from which it could reject McLain's expert conclusion, and substantial evidence supports the court's ruling. This evidence was reasonable, credible and of solid value. Consequently, the trial court did not err and the present claim fails.

Rivera, 2024 WL 3944664, at *4–6.

1. Legal Standard

"A criminal defendant may not be tried unless he is competent." Pate v. Robinson, 383 U.S. 375, 378 (1966); accord Medina v. California, 505 U.S. 437, 439 (1992); see also Drope v. Missouri, 420 U.S. 162, 172 (1975) ("[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial"); Sully v. Ayers, 725 F.3d 1057, 1070 (9th Cir. 2013). Relatedly, a criminal defendant may not waive his right to counsel or plead guilty unless he does so "competently and intelligently[.]" Johnson v. Zerbst, 304 U.S. 458, 468 (1938); accord Godinez v. Moran, 509 U.S. 389, 396 (1993).

The trial or conviction of a person who is legally incompetent is a violation of substantive due process. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); see also Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010) ("It is undisputed that the conviction of an accused person while he is legally incompetent violates due process.") (quoting Robinson, 383 U.S. at 378).

"[T]he standard for competence to stand trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." Moran, 509 U.S. at 396 (citing Dusky v. United States, 362 U.S. 402, 402 (1960)); see also Clark v. Arnold, 769 F.3d 711, 729 (9th Cir. 2014). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Anderson v. Gipson, 902 F.3d 1126, 1133 (2018) (citing Drope, 420 U.S. at 171).

A "substantive" competency claim focuses on whether the defendant was actually incompetent at trial. Boyde v. Brown, 404 F.3d 1159, 1165 (9th Cir. 2005). "Even where the evidence before the trial judge was insufficient to raise a good faith doubt with respect to [defendant]'s competency, he would still be entitled to relief if it now appears that he was in fact incompetent." Id. (quoting Steinsvik v. Vinzant, 640 F.2d 949, 954 (9th Cir. 1981)); Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003).

13

1    The petitioner bears the burden of proof on a claim of incompetency to stand trial by a

2  preponderance of the evidence. Hayes v. Woodford, 301 F.3d 1054, 1078 n.28 (9th Cir. 2002)

3  (citing Simmon v. Blodgett, 110 F.3d 39, 41 (9th Cir. 1997)), *rev'd en banc on other grounds sub*

4  *nom.* Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005); see also Cacoperdo v. Demosthenes, 37 F.3d

5  504, 510 (9th Cir. 1994).

6    2.  Analysis

7    Petitioner claims the trial court erroneously rejected the opinion of Dr. McLain in finding

8  him competent to stand trial. He alleges it was error for the trial judge to make its own credibility

9  determination and reject the expert's opinion. Respondent argues that it was not unreasonable for

10  the trial judge to disbelieve Dr. McLain, because McLain based her conclusions almost

11  exclusively on crediting Petitioner's own assertions.  Respondent contends the trial court

12  reasonably determined that Petitioner was competent based on his own observations of

13  Petitioner's behavior in trial proceedings, the testimony of lay witnesses, and Petitioner's

14  telephone conversations.

15    The Supreme Court's opinion in an analogous case, Maggio v. Fulford, 462 U.S. 111

16  (1983), is instructive. In Maggio, an expert witness, a psychiatrist, testified on the eve of trial that

17  the defendant was incompetent to stand trial. Id. at 112. Like this case, the expert spent a brief

18  amount of time, an hour, evaluating the defendant. Like this case, the expert's opinion went

19  unchallenged by any other expert. Id. The trial judge rejected the expert's opinion and concluded

20  Petitioner was competent. Id. at 113. The trial judge determined Petitioner was competent based

21  on the defendant's conduct during and after trial. Id. The Supreme Court found that the trial judge

22  reasonably concluded the defendant was competent based on his own observations. Id. at 117.  In

23  Maggio, the defendant raised the same argument as Petitioner. He claimed that the trial judge

24  failed to credit the expert's testimony solely because the expert's opinion went "unimpeached."

25  The Supreme Court rejected the claim, stating: "This is simply not the law." Id. at 117-18.  The

26  Supreme Court concluded that the trial court's conclusions were "fairly supported by the record."

27  Id. at 118.

28    Here, as in Maggio, the trial judge observed Petitioner's behavior at trial. The judge also

14

1    heard Petitioner's recorded phone calls from jail. In those phone calls, Petitioner had discussions

2    with various members of his family, was oriented to time and place, and did not exhibit confusion

3    or mental difficulties. Indeed, his discussions showed he was well in possession of his mental

4    faculties. He encouraged his younger sister to keep her grades up, to attend college, and to get a

5    scholarship. He advised his mother on refinancing her car loan, and suggested she look into a

6    multi-car discount from her insurance company. In another call, he discussed his financial

7    account in jail, and advised his family not to put money in his account so he could get more free

8    stamps. He further told his family members to send mail using a P.O. Box so people would not

9    know his street address.

10        Other witnesses also testified as to their interactions with Petitioner.  The victim's son

11   testified that he had worked with Petitioner for approximately eight months, and Petitioner never

12   demonstrated mental issues. He never observed Petitioner talking to himself, hearing voices, or

13   mentally struggling. The son noted that Petitioner had filed workers' compensation claims.

14        Four correctional officers also testified regarding their interactions with Petitioner. The

15   officers spent a substantial amount of time with Petitioner during their shifts. They did not

16   observe Petitioner experiencing auditory or visual hallucinations, nor did they see Petitioner act

17   strangely. One deputy testified that she went over a mental health questionnaire with Petitioner,

18   and he answered all her questions appropriately. She noted he was friendly and talkative, and

19   denied having any mental issues.

20        Regarding Dr. McLain, the trial judge found she presented well as a witness, but found

21   her evaluation to be very limited. Dr. McLain did not review any mental health records because

22   there were none, and based her evaluation solely on Petitioner's own self-serving assertions and

23   self-reported actions. Dr. McLain admitted she did not have all the information, did not know

24   about the recorded phone calls, and was unaware of the police reports. She did not know

25   Petitioner had filed workers' compensation claims. In addition, much of McLain's testimony

26   demonstrated Petitioner's competence. She noted that Petitioner understood the judicial process,

27   the nature of the charges, the roles of the participants, and that he faced incarceration. This was

28   congruent with the trial court's conclusion that Petitioner was competent.

Furthermore, in her evaluation which was conducted later in the trial, Dr. Leite concluded Petitioner was malingering. This reaffirmed the trial court's conclusion that Petitioner was not incompetent.

In summary, Petitioner fails to demonstrate that the state court's rejection of his claim was contrary to, or an unreasonable application of, Supreme Court authority. Petitioner also fails to show that the state court's determination was an unreasonable determination of the facts. Petitioner has not shown the state court's factual findings to be "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500. Accordingly, the claim should be denied.

**IV.    RECOMMENDATION**

Based on the foregoing, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus (Doc. 1) be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, a party may file written objections with the Court and serve a copy on all parties. Id. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014).  This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure,

should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated:    **December 10, 2025**                    /s/ *Sheila K. Oberto*
                                                   UNITED STATES MAGISTRATE JUDGE